UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABRAHAM AMIRA,<br><br>Defendant. | CASE NO. 2:23-cr-184<br><br>JUDGE MICHAEL H. WATSON<br><br>**SUPERSEDING INFORMATION**<br>18 U.S.C. § 371<br>18 U.S.C. § 1343<br><br>**FORFEITURE** |

**THE UNITED STATES ATTORNEY CHARGES:**

**BACKGROUND**

At times material to this Superseding Information:

1. The defendant, **ABRAHAM AMIRA**, and his coconspirator, Michael Brammer, resided in the Southern District of Ohio.

2. **AMIRA** controlled Ohio entities Mar Z, Inc. and Ohio Surplus LLC, both headquartered in the Southern District of Ohio.

3. **AMIRA**, through Ohio Surplus and Mar Z, purchased and sold surplus assets from the Surplus Department of The Ohio State University (the "OSU Surplus Department").

4. **AMIRA** owned and operated several cash-intensive businesses, including a strip club and a restaurant, and frequently withdrew and deposited large amounts of cash.

5. From on or about October 7, 2009, through on or about September 3, 2020, Brammer was an employee and agent of The Ohio State University ("OSU"). Brammer worked in the OSU Surplus Department, with responsibilities that included evaluating and disposing of surplus assets of the University, including used computers and peripherals, generally through recycling or public sale.

6. Each year from 2015 through 2019, OSU was an organization, government, and agency that received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance.

7. **AMIRA** controlled a First Financial Bank account with account number ending x2473 (the "FFB x2473 Account").

## COUNT 1
### (Conspiracy to Commit Federal Program Theft, 18 U.S.C. § 371)

8. Paragraphs 1 through 7 are incorporated here.

9. From in or around late 2015, and continuing thereafter until in or around August 2019, in the Southern District of Ohio, **ABRAHAM AMIRA**, Brammer, and others known and unknown to the Grand Jury, knowingly and voluntarily conspired and agreed to commit federal program theft, in violation of 18 U.S.C. § 666(a)(1)(A).

### Manner and Means of the Conspiracy

10. It was part of the conspiracy that:

   a. **AMIRA** made cash payments directly to Brammer, and in exchange Brammer gave or sold at artificially low prices certain OSU Surplus Department assets to **AMIRA**. Many of these assets were Apple computers, laptops, or other equipment in good condition that the OSU Surplus Department could otherwise have disposed of or sold to the public at higher prices.

   b. Brammer did not include these stolen assets on OSU Surplus Department invoices to **AMIRA**'s company Mar Z, or he described them on such invoices as being in significantly worse condition than they were, often selling them as "scrap" or falsely stating that they were damaged. **AMIRA** generally paid OSU Surplus Department invoices by credit card.

2

c. **AMIRA** identified for Brammer the types of assets he wanted to acquire fraudulently from the OSU Surplus Department, sometimes in general terms, and sometimes by identifying specific assets in the OSU Surplus Department's inventory.

d. **AMIRA** suggested to Brammer that the two should communicate about these assets via a secure messaging system, WhatsApp, rather than through more standard text-messaging applications.

e. Brammer sent WhatsApp text messages to **AMIRA** identifying newly arrived OSU Surplus Department assets, especially computers, that **AMIRA** might want to secure through his fraudulent arrangement with Brammer. The two further arranged a price and pickup time, sometimes via WhatsApp, and other times by phone or in person.

f. **AMIRA** paid Brammer in cash on an irregular basis, often days or even weeks after receiving the assets. Sometimes **AMIRA** made the payments to Brammer at the OSU Surplus Department, and sometimes he met Brammer for payment at other locations, such as **AMIRA**'s bank, business, or home.

g. **AMIRA** sometimes picked up assets personally at the OSU Surplus Department and sometimes sent employees to pick them up. **AMIRA** and his employees sometimes picked up legitimately purchased assets at the same time they picked up stolen and fraudulently acquired assets.

h. **AMIRA** maintained a warehouse in Columbus, Ohio (the "Columbus Warehouse"), where he employed at least one person, through Ohio Surplus, to prepare the stolen assets for resale, especially Apple computers and laptops.

i. **AMIRA** sold many of the fraudulently acquired assets on GovDeals, an online auction site generally used by government entities, including OSU. Brammer

enabled **AMIRA** to sell through GovDeals by falsely telling GovDeals that **AMIRA** was a certified OSU vendor.

### Overt Acts

11. In furtherance of the conspiracy and to accomplish its objects, the following overt acts, among others, were committed in the Southern District of Ohio:

*July 2016 Transaction*

a. On or about July 14, 2016, via WhatsApp, Brammer sent **AMIRA** several images of Apple laptop computers at the OSU Surplus Department.

b. **AMIRA** responded, "Ok great."

c. After sending **AMIRA** another image of computers, Brammer sent a message: "I have 15 come on now total $2000."

d. On or about July 14, 2016, **AMIRA** received the computers and paid Brammer cash for them. OSU Surplus Department invoice records show no sales of these computers or laptops to Mar Z.

e. From on or about July 14, 2016, through on or about July 29, 2016, Brammer made approximately seven cash deposits totaling approximately $9,950.

*August 2016 Transaction*

f. On or about August 23, 2016, via WhatsApp, Brammer sent **AMIRA** a photograph of over a dozen Apple laptops.

g. The two arranged an exchange for the following day, when Brammer's supervisor would not be present. Brammer gave **AMIRA** a price for the computers and a pretext for coming to the OSU Surplus Department: "I can do 15 tomorrow plus one iMac $1600. You can also pick up your scale as your reason for stopping in."

4

h.      On or about the next day, August 24, 2016, **AMIRA** or his employees picked up the computers from the OSU Surplus Department and paid Brammer in cash for them. OSU Surplus Department invoice records show no sales of these laptops or an iMac to Mar Z.

i.      From on or about August 24, 2016, through on or about August 31, 2016, Brammer made approximately four cash deposits totaling approximately $4,700.

*November 2017 Transactions*

j.      On or about November 7, 2017, via WhatsApp, Brammer sent **AMIRA** several photos of equipment, including an Apple MacBook Pro, approximately thirty Cisco switches, approximately 27 LG TVs or monitors, and approximately 132 Fluke 51 K/J thermometers. With respect to the thermometers, Brammer noted, "$40 parts only $289 working." **AMIRA** replied, "Looks good," and "Ok great."

k.      On or about November 9, 2017, via WhatsApp, Brammer sent **AMIRA** photos and other information about a pallet of approximately 99 display-mounted mini-computers manufactured by Tangent, along with photographs of Apple iMac computers and other equipment.

l.      Also on or about November 9, 2017, **AMIRA** sent Brammer a photograph of a handwritten list including "1-MacPro," "Cisco Switch's," "132 Fluke," "2722" TV's," and "skid computers." Brammer clarified that the "skid of CPU's is the Tangents."

m.      On or about November 9, 2017, **AMIRA** received some or all of the equipment on his handwritten list and paid Brammer cash for them. OSU Surplus Department invoice records show no sales of this equipment to Mar Z.

n.      From on or about November 9, 2017, through on or about November 30, 2017, Brammer made approximately eight cash deposits totaling approximately $8,100.

5

*April 2018 Transactions*

o.  On or about April 26, 2018, via WhatsApp, Brammer sent **AMIRA** photographs of several computer items, including many computers and laptops.

p.  "Lock them up!!" **AMIRA** responded, then followed up with a handwritten list of several items, including "1-MacBook Pro," "1-Mac Air," "2-27″ iMac's," "1-21 iMac," "skids of computers," and "Think Pad." OSU Surplus Department invoice records show only scrap computer sales to Mar Z during the relevant period for a total of approximately $136.

q.  On or about April 27, 2018, via WhatsApp, Brammer sent **AMIRA** photographs of an HP laptop that he described as "Brand new in box never used."

r.  **AMIRA** replied, "That's what I want…how many do you have?" and asked Brammer to call him.

s.  On or about April 30, 2018, after Brammer had also sent photos of several other pieces of equipment, **AMIRA** told Brammer to "hand [an employee of **AMIRA**'s] the new laptop."

t.  On or about April 30, 2018, **AMIRA** received some or all of the equipment on his handwritten list and paid Brammer cash for them. OSU Surplus Department invoice records during the relevant period do not show sales to Mar Z of the items on **AMIRA**'s list.

u.  From on or about April 27, 2018, through on or about May 14, 2018, Brammer made approximately five cash deposits totaling approximately $8,350.

6

*Late June and Early July 2018 Transactions*

v. From in or around late June 2018 through in or around early July 2018, via WhatsApp, **AMIRA** expressed interest in several computers and other pieces of equipment of which Brammer sent photos.

w. On or about July 10, 2018, Brammer sent **AMIRA** a handwritten list of five serial numbers associated with functioning MacBook laptops, and **AMIRA** replied, "Looks good." Included in these were serial numbers C2WFCS36DH2G, C1ML55B7DTY4, and CO2HD1FJDV16.

x. On or about July 11, 2018, **AMIRA** received these laptops and paid Brammer cash for them. Over the next several months, **AMIRA** sold these three MacBook laptops on GovDeals, for $400 or more each. OSU Surplus Department invoice records show no sales of these laptops to Mar Z.

y. On or around July 11, 2018, and again on or around July 18, 2018, Brammer made a cash deposit of approximately $3,000, for a total of approximately $6,000.

*Late July 2018 Transaction*

z. On or around July 25 and July 26, 2018, via WhatsApp, Brammer sent **AMIRA** several photos of computer equipment in which **AMIRA** expressed an interest, including a MacBook Air laptop computer. One photo of this laptop displayed its serial number: C02H924EDJWV.

aa. On or around July 26, 2018, **AMIRA** received this MacBook Air and paid Brammer for it in cash.

bb. On or about September 27, 2018, **AMIRA** sold this MacBook Air on GovDeals for approximately $300.

cc. On or around July 27, 2018, **AMIRA** received and later paid an OSU Surplus Department invoice that shows the sale to Mar Z of four "Scrap IMACS (non-working)" for $40, but not this MacBook Air.

dd. From on or around July 26, 2018, through on or around August 10, 2018, Brammer made approximately seven cash deposits totaling approximately $15,801.

*August 15 and 16, 2018 Transaction*

ee. On or around August 15, 2018, via WhatsApp, Brammer sent **AMIRA** a photograph of a Dell 9030 All-In-One computer—apparently undamaged and in working condition—and two MacBook Air laptops, noting, at **AMIRA**'s request, that the OSU Surplus Department had ten of the Dell computers and two of the MacBook laptops.

ff. On or around the following day, August 16, 2018, **AMIRA** sent a photograph of a handwritten list of equipment, including "16 Dell All In One 1-Damaged," "2-Air complete," and several other Apple computers and laptops, two of which were described as "cracked" iMacs.

gg. Brammer responded, "I sent 2 extra Dell I5 laptops for your enjoyment / I also gave them some mice."

hh. "Hell yes / Give me a call please," was **AMIRA**'s reply.

ii. On or around August 16, 2018, **AMIRA** received and later paid an OSU Surplus Department invoice that listed five "IMACS (scrap busted screen)" for $30, and ten "Dell (AIOBusted Screen)" for $60.

jj. On or around August 16, 2018, Brammer made cash deposits of approximately $1,000 and $6,000, and over the next three weeks he made several more cash deposits ranging from $500 to $2,980, totaling more than $7,000.

8

*Late August 2018 to Late January 2019 Transactions*

kk. From on or around August 23, 2018, through on or around January 25, 2019, **AMIRA** and Brammer communicated on several occasions via WhatsApp. In these conversations, Brammer sent photos of dozens of computers, laptops, tablets, and smartphones, many manufactured by Apple. Many appear to be in good condition, and many are shown to be operational. On many occasions, **AMIRA** expressed interest in the equipment and arranged a pickup.

ll. **AMIRA** received some or all of the equipment in the photographs and paid Brammer cash for them.

mm. During this same period, **AMIRA** paid several OSU Surplus Department invoices that in total show sales to Mar Z of approximately 25 Apple computers, which are generally described on the invoices as "scrap." The total amount **AMIRA** paid for these items was approximately $430.

nn. During this same period, **AMIRA** sold on GovDeals at least five Apple MacBooks received from OSU Surplus Department for a total of over $2,000.

oo. During this same period, Brammer made numerous cash deposits totaling over $25,000.

*March 2019 Transaction*

pp. On or around March 7, 2019, via WhatsApp, Brammer sent **AMIRA** photos of seven Apple computers, a pallet of several projectors, and other equipment.

qq. On or around March 7, 2019, **AMIRA** received some or all of the equipment photographed and paid Brammer for it in cash.

9

rr. On or around March 7, 2019, **AMIRA** received and later paid an OSU Surplus Department invoice to Mar Z that listed projectors and other "electronic waste," all sold for a total of approximately $89, with no mention of computers.

ss. From on or about March 7, 2019, through on or about March 29, 2019, Brammer made approximately 6 cash deposits totaling approximately $9,500.

*April 2019 Transaction*

tt. On or around April 18, 2019, Brammer sent **AMIRA** photos of several Apple hard drives, laptops, and computers, and several Cisco network switches, to which **AMIRA** responded, "Give me a call."

uu. The following day, April 19, 2019, Brammer sent photos of an iPhone and another Apple computer and asked **AMIRA** to "[m]ake sure [an **AMIRA** employee] has a box and blankets."

vv. After **AMIRA** agreed, Brammer cautioned: "Make sure you are here at 2. I got [an OSU Surplus Department supervisor] back here also go to the bank."

ww. On or around April 19, 2019, **AMIRA** received some or all of the equipment photographed and paid Brammer for it in cash.

xx. On or about April 19, 2019, **AMIRA** received and later paid an OSU Surplus Department invoice to Mar Z that listed "electronic waste" but no computers, smartphones, or laptops; the total amount of the invoice was approximately $78.

yy. From on or around April 19, 2019, through on or around May 8, 2019, Brammer made approximately three cash deposits totaling approximately $4,460.

*May 2019 Transaction*

zz. On or around May 24, 2019, Brammer sent **AMIRA** a message via WhatsApp listing "Today's pickup." It listed five Apple iMac computers, noting that one

10

"does not power on may be missing ram." It also listed five Apple MacBook laptops, an Apple Mac Mini computer, twelve Apple MacBook Pro laptops "missing HDD [hard disk drive]," two additional Apple iMac computers, and an Apple MacBook laptop "with HDD unloaded."

aaa. On or around May 24, 2019, **AMIRA** received some or all of the equipment photographed and paid Brammer for it in cash.

bbb. On or about May 24, 2019, **AMIRA** received and later paid an OSU Surplus Department invoice to Mar Z that listed ten Apple MacBook Pro laptops and six Apple iMac computers, all described as scrap; the total invoice amount was approximately $298.

ccc. From on or about May 24, 2019, through on or about June 14, 2019, Brammer made approximately six cash deposits totaling approximately $9,300.

*August 2019 Transaction*

ddd. On or around August 9, 2019, via WhatsApp, Brammer sent **AMIRA** photos of Dell and IBM laptops.

eee. **AMIRA** asked for a quantity, and Brammer responded, "About 15 but all high end with drives included."

fff. On or around August 9, 2019, **AMIRA** received some or all of the laptops photographed and paid Brammer for them in cash.

ggg. On or about August 9, 2019, **AMIRA** received and later paid an OSU Surplus Department invoice to Mar Z for approximately $80 that listed no laptops or computers.

hhh. From on or about August 9, 2019, through on or about August 23, 2019, Brammer made approximately three cash deposits totaling approximately $5,700.

11

**In violation of 18 U.S.C. § 371.**

## COUNT 2
### (Wire Fraud, 18 U.S.C. § 1343)

12. During the COVID-19 epidemic, the United States government administered several programs to provide financial relief to distressed individuals and businesses. Among these were the Paycheck Protection Program (PPP), the Economic Injury Disaster Loan (EIDL) program, and the Restaurant Revitalization Fund (RRF). Applicants for these programs were required to make affirmative certifications to establish eligibility, including about information such as payroll expenses and number of employees. Each program imposed limits on how the money could be spent—generally speaking, to pay furloughed employees and otherwise keep an existing business afloat—and PPP loans could ultimately be forgiven if the recipient used a specified percentage of the funds on payroll.

13. Between on or about April 1, 2020 and December 16, 2021, in the Southern District of Ohio and elsewhere, the defendant **ABRAHAM AMIRA**, with intent to defraud, devised, intended to devise, and knowingly participated in a scheme to defraud and to deprive another of money and property by materially false and fraudulent pretenses, representations, and promises; that is, **AMIRA** fraudulently applied for and improperly spent the proceeds of several PPP loans, EIDLs, and an RRF.

### The Scheme

**AMIRA's** scheme to defraud included the following:

14. **AMIRA** applied for one of his PPP loans in his mother's name, had the proceeds deposited into a joint account he held with his mother, spent the proceeds on personal expenses, and sought forgiveness of the loan falsely claiming nearly all funds had been spent on payroll.

12

15. **AMIRA** applied for PPP loans for several of his businesses, then spent the proceeds on personal expenses and impermissible business expenses, and he sought forgiveness of the loans falsely claiming to have spent the funds on payroll.

16. **AMIRA** applied for multiple EIDL loans in the names of various businesses, then spent the proceeds on personal expenses and impermissible business expenses. For one loan, received for one of his strip clubs, **AMIRA** had the EIDL funds deposited directly into his personal bank account and spent them on personal expenses, including a $50,000 downpayment on a Porsche 911 Turbo S cabriolet, listed for over $170,000.

17. **AMIRA** applied for an RRF for his strip club, which was not entitled to RRF funds, using its legal name, 155 North Fifth Street, Inc., but not its registered trade name, Sirens Gentlemen's Club. Contrary to **AMIRA's** affirmations in the application, the club was earning significant revenues and did not require government funding. **AMIRA** spent the money on unauthorized expenses.

### Execution of the Scheme

18. On or about May 19, 2020, in the Southern District of Ohio, for the purpose of executing the scheme described above, and attempting to do so, the defendant, **ABRAHAM AMIRA**, caused to be transmitted signals and sounds by means of wire communication in interstate commerce; that is, he caused the disbursement of EIDL funds from a server in Sterling, Virginia to his bank account in Columbus, Ohio.

**In violation of 18 U.S.C. § 1343.**

### FORFEITURE

19. The allegations of this Superseding Information are incorporated herein for the purpose of alleging forfeiture to the United States of America.

13

20. Upon conviction of the offenses alleged in this Superseding Information, the defendant, **ABRAHAM AMIRA**, shall forfeit to the United States any property, real or personal, constituting or derived from proceeds traceable to any of the offenses alleged in this Superseding Information, in violation of 18 U.S.C. §§ 371 and 1343, in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

**Forfeiture notice in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and Rule 32.2 of the Federal Rules of Criminal Procedure.**

        **KELLY A. NORRIS**
        **ACTING UNITED STATES ATTORNEY**

        _____
        **DAVID J. TWOMBLY (0092558)**
        **Assistant United States Attorney**